Filed 3/21/16  Healthsmart Pacific, Inc. v. Lyons CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Matter Of:  HEALTHSMART PACIFIC, INC., etc., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> GREGORY ARISTOTLE LYONS, <br><br> Defendant and Appellant. | B261088 <br><br> (Los Angeles County <br> Super. Ct. No. NS023726, NS023727, <br> NS023728, NS023758) |

APPEAL from orders of the Superior Court of Los Angeles County, Ana Maria Luna, Judge.  Affirmed.

Gregory A. Lyons, in pro. per., for Defendant and Appellant.

Fink & Steinberg, Keith A. Fink, S. Keven Steinberg, Olaf J. Muller, for Plaintiffs and Respondents.

## INTRODUCTION

This matter is before us for a second time. Defendant and appellant Gregory Lyons (Mr. Lyons), worked as a security guard for plaintiff and respondent Healthsmart Pacific, Inc., doing business as Pacific Hospital of Long Beach (Pacific).[1] After Pacific terminated his employment, Mr. Lyons filed an action against Pacific. Pacific successfully moved for summary judgment in that action. Thereafter, Pacific sought restraining orders against Mr. Lyons to protect certain employees against conduct it viewed as threatening. Plaintiff and respondent Fink & Steinberg, Pacific's attorneys, also sought restraining orders against Mr. Lyons to protect its employees.[2] The trial court issued permanent workplace violence restraining orders against Mr. Lyons and in favor of Pacific and its attorneys. Mr. Lyons appealed from those restraining orders, which appeals we consolidated and heard in case number B237428. In accordance with the mandatory standard of review, we affirmed the trial court's orders.

After the trial court entered the restraining orders, the Los Angeles City Attorney brought a case against Mr. Lyons asserting 33 misdemeanor counts of violating the restraining orders. Mr. Lyons was found guilty as charged and incarcerated. After Mr. Lyons was released from custody, plaintiffs[3] asked the trial court to renew or extend by three years the permanent restraining orders against Mr. Lyons. The trial court granted the request and Mr. Lyons appeals. On appeal, Mr. Lyons contends that the trial court's

---

[1]   Counsel for Pacific represented to the trial court that the hospital was acquired by College Medical Center.

[2]   The trial court issued Pacific restraining orders in case numbers NS023726 (Tia Schiller) and NS023728 (Jennifer and Alicia Patterson). Alicia Patterson is Jennifer Patterson's daughter. Because they share the same last name, for clarity, we will refer to Jennifer Patterson and Alicia Patterson individually by their first names. The trial court issued Fink & Steinberg restraining orders in case numbers NS023727 (Olaf Muller) and NS023758 (Keith Fink and Sarah Hernandez).

[3]   We will refer collectively to Ms. Schiller, the Pattersons, Mr. Muller, Mr. Fink, and Ms. Hernandez as "plaintiffs."

extension of the permanent restraining orders violates the United States Constitution's bar on double jeopardy, the orders are barred by the doctrine of collateral estoppel, the orders were entered in violation of his right to counsel under the Sixth Amendment to the United States Constitution, and plaintiffs' counsel committed a fraud on the court in the original restraining order proceeding and in the proceeding on the requests to renew those restraining orders. Applying the mandatory standard of review discussed post, we affirm.

## BACKGROUND[4]

We set forth the facts from our March 26, 2013, opinion as background, omitting unnecessary footnotes:

"On February 28, 2011, Pacific filed petitions for restraining orders against Mr. Lyons to protect Tia Schiller, Pacific's Vice President of Human Resources; Jennifer, Pacific's Human Resources Director; and Alicia. On February 28, 2011, Fink & Steinberg filed a petition for a restraining order against Mr. Lyons to protect Mr. Fink and Ms. Hernandez. [Fn. omitted.] On March 8, 2011, Fink & Steinberg filed a petition for a restraining order against Mr. Lyons to protect Mr. Muller.

"**A. Content of Ms. Schiller's Declaration**

"In support of its request for a restraining order to protect Ms. Schiller, Pacific submitted Ms. Schiller's declaration in which she addressed Mr. Lyons's employment and termination. Ms. Schiller stated that Mr. Lyons worked as a security guard for Pacific for seven months beginning in February 2009 and ending in September 2009. During his employment, Mr. Lyons received verbal and written warnings concerning his failure to follow various Pacific procedures. Pacific received complaints from its security guard Martin Maldonado and from third party vendor Eladio Chavez that Mr. Lyons made inappropriate comments, disparaged another employee, and repeatedly called an employee during non-work hours. In August 2009, Jennifer informed Mr. Lyons that his

---

4  We grant Mr. Lyons's September 16, 2015, motion to augment the record.

3

employment was suspended pending Pacific's investigation of the various complaints about him.

"In the course of Pacific's investigation, one of Mr. Lyons's supervisors expressed the view that while [*sic*] Mr. Lyons initially appeared to be a diligent and hard working employee who was eager to learn and follow security department procedures, but then had engaged in increasingly odd behavior on the job during the two months preceding his suspension.

"Following Mr. Lyons's suspension, he communicated with Pacific's President and CEO about his suspension, made accusations against employees, and claimed racial harassment and discrimination. Four days after he was suspended, Mr. Lyons e-mailed Ms. Schiller demanding that Pacific return his security officer badge and uniform immediately and that Ms. Schiller help him '"schedule a joint news conference as soon as your investigation is over with I have all the same documents that I gave to you ready to release to the report's [*sic*].'" During his suspension, Mr. Lyons continued to call an employee at all hours of the day and night despite her repeated demands that he stop. Pacific terminated Mr. Lyons's employment at the end of its investigation on the ground that because [*sic*] he 'displayed unacceptable unprofessional behavior toward vendors and co-workers. This behavior includes death threats and stalking.' Pacific extended Mr. Lyons's medical benefits for one month so that he could seek counseling and treatment for his 'obvious psychological problems.' After his termination, Mr. Lyons made copies of his termination letter, which he posted around Pacific. In the months following his termination, Mr. Lyons repeatedly was seen around Pacific.

"**B.    Content of Jennifer's Declaration**

"In a declaration submitted in support of Pacific's request for a restraining order to protect Jennifer and Alicia, Jennifer stated that during Mr. Lyons's suspension, Mr. Lyons sent her several e-mails accusing her of violating various laws. Two days after Pacific terminated Mr. Lyons's employment, Jennifer saw Mr. Lyons at Pacific. Around the same time, Mr. Lyons called Jennifer and accused her of violating the law by

4

suspending and terminating his employment. Mr. Lyons claimed she would be liable to Pacific for $5 million for terminating his employment. Mr. Lyons called Alicia and demanded Jennifer's personal cell phone number. Shortly thereafter, Pacific and Jennifer were granted a temporary restraining order against Mr. Lyons, but were denied a permanent restraining order.

"In January 2011, Mr. Lyons contacted Jennifer through her Facebook account and claimed that Mr. Fink was demanding that he respond to a motion Mr. Fink filed in Mr. Lyons's employment action against Pacific that concerned Alicia's 'drinking problem' and the number of times he reported her for being intoxicated at work. Mr. Lyons stated that Alicia should be left out of the 'court battle.' Mr. Lyons said, 'Fair is fair, but you[r] own attorney for the hospital should not be bringing up your daughter, and making allegations against your daughter, and now demanding that a Los [A]ngeles Superior Court Judge order me to answer questions about your own daughter. She seemed like a nice girl, I never knew her, and we really didn't work that much together. The press is getting these exact same documents. If you guys want to sling allegations against me ok. But let[']s leave Alicia out of the Wrongful termination case.' The same day, Mr. Lyons contacted Alicia through her Facebook account and left a message addressing the same subject.

"Jennifer stated that she was aware that Mr. Lyons was trained in the use of firearms, owned several firearms, and was a United States Navy veteran. She further stated that Mr. Lyons had been seen in recent months driving around Pacific wearing his former Pacific security guard uniform even though he no longer worked there. Jennifer believed that Mr. Lyons had focused his anger over his termination on her in particular and had made clear that he would not leave her alone. She felt 'constant anxiety' that Mr. Lyons would appear at Pacific or at her home when Alicia and her other children were present and feared for her and her family's safety.

"**C.    Content of Mr. Muller's Declaration**

"In Mr. Muller's February 28, 2011, declaration in support of Pacific's request for a restraining order to protect Jennifer and Alicia, Mr. Muller stated that Mr. Lyons sent him a declaration on February 26, 2011, in connection with an ex parte application in which Mr. Lyons stated that he had informed 'law enforcement of the criminal actions of all parties involved.' [Fn. omitted.] Mr. Lyons informed the trial court that he gave notice of the ex parte application by e-mail because he feared that violence would break out once the trial court turned the matter over to the District Attorney's Office. According to Mr. Lyons, he received death threats after reporting the parties' criminal actions to law enforcement and he would be forced to wear a bullet-proof vest for the rest of his life.

"Mr. Muller believed that Mr. Lyons would attempt to attack or shoot him, other attorneys or staff at his law firm, and Ms. Schiller, Jennifer, or other Pacific employees for suspending and terminating his employment and for having his employment action against Pacific dismissed. Mr. Muller viewed Mr. Lyons's declaration as an attempt to portray himself as a victim and to justify any violent action by him as self-defense. According to Mr. Muller, Mr. Lyons's e-mail messages to him in the prior two weeks had grown increasingly angry and frantic.

"Mr. Muller attached to his declaration an excerpt from Mr. Lyons's 2007 deposition in a civil case in which Mr. Lyons testified that he had been charged with conspiracy to commit murder in 1978. Mr. Lyons testified that he hired someone to kill a defendant who was in jail custody whom Mr. Lyons wanted killed because he had molested Mr. Lyons when Mr. Lyons was a child. The perpetrator whom Mr. Lyons hired stabbed the defendant in the eye while the defendant was being transported to court on a bus. Mr. Lyons believed that murder was justified in that case. The perpetrator received a life sentence at Patton State Hospital, and the charge against Mr. Lyons was reduced to assault.

6

"**D.     Content of Mr. Fink's Testimony**

"In November 2011, the trial court held a joint hearing on Pacific's and Fink & Steinberg's petitions for restraining orders.  At the hearing, Mr. Fink testified that he had received numerous e-mails and faxes from Mr. Lyons since April 2010.  At times, the faxes were so long—approximately 600 pages—that the fax machine would run out of paper and turn off.  Some of the communications asserted that Mr. Fink and Mr. Muller wanted to sexually attack him.

"Mr. Fink received an e-mailed declaration from Mr. Lyons in which Mr. Lyons declared that he had purchased a bulletproof vest because he believed that Mr. Fink and Mr. Muller had made death threats to him.  Because Mr. Fink had not threatened Mr. Lyons, he interpreted Mr. Lyons's declaration as a threat to shoot him.  A week prior to the hearing, Mr. Fink received a communication from Mr. Lyons asserting that Mr. Fink would lose at the hearing and Mr. Lyons's 9 millimeter gun would be returned to him.  Mr. Fink testified that Mr. Lyons filed a petition for a restraining order in which Mr. Lyons claimed to have 'received scores of death threats and [to] have been stalked by Olaf Muller and Keith Fink.'  According to the petition, Mr. Lyons received no less than 80 death threats between January 1, 2010, and June 16, 2011.  Mr. Lyons stated that he had received over 75 calls from Mr. Muller and Mr. Fink.  Mr. Fink never made a death threat to Mr. Lyons and had not called Mr. Lyons.  Mr. Lyons's petition stated, '"I have to put up with Olaf Muller calling me and saying, 'I will blow your head off.  I will shoot you when you come out of your house.  You better watch your back as we have you under surveillance and we can kill you at any time.'"'

"Mr. Lyons's petition further stated, '"The conduct of Olaf Muller and Keith Allen Fink has increased to the point that both Olaf Muller and Keith Allen Fink have continued to play a tag-team match, calling my home and making such sounds in the phone as we want you to come out, fat boy, so we can shoot at your big butt."'  The statement concerned Fink enough that he paid a significant amount of money to install a security gate in front of his house.  In its ruling on Mr. Lyons's petition, the trial court in that case stated, '"A thorough reading of all papers submitted by petitioner causes the

7

court to believe Mr. Lyons may have some issues re mental health, i.e. claims of being sexually abused by attorney Olaf and Fink.'"

"Mr. Fink believed that Mr. Lyons was a threat to him because Mr. Lyons's friend and attorney Andrew Smyth told Mr. Fink that he had received e-mails from Mr. Lyons that concerned him, one of which he forwarded to Mr. Fink. That e-mail attached a document that stated, 'You are ruined because of them strike back like a real man. Don't be a little bitch.' The document said that certain employees at Pacific, including Ms. Schiller and Jennifer, were laughing at Mr. Lyons. It further had remarks disparaging of Mr. Lyons. Mr. Fink believed that Mr. Lyons authored the document and believed that Mr. Lyons intended the document to camouflage his actions after he harmed Mr. Fink or the other plaintiffs. Mr. Fink believed that the nature of Mr. Lyons's threats was escalating.

"On four occasions, Mr. Smyth e-mailed Mr. Fink advising him that the restraining order proceedings were a mistake, that Mr. Lyons was mentally ill, and that if Mr. Fink and the others continued with the restraining order proceedings Mr. Lyons would 'snap' and they would be harmed. Mr. Smyth told Mr. Fink that in 2007 Mr. Lyons was angry with Mr. Smyth and threatened to put him and his wife in a coma. [Fn. omitted.] Mr. Fink believed that Mr. Lyons's threats to plaintiffs had escalated since he lost his employment action.

"Mr. Lyons threatened to have Mr. Fink arrested. Mr. Lyons filed complaints against Mr. Fink with the state bar, the F.B.I., and the District Attorney's Office. Mr. Fink was also concerned because Mr. Lyons appeared to be overly preoccupied with every aspect of Mr. Fink's life. Mr. Lyons sent e-mails to others concerning Mr. Fink.

"**E. Content of Mr. Taylor's Testimony**

"Randolph Taylor, Pacific's Risk Manager, testified at the hearing that he was contacted about Mr. Lyons in September 2009, after Mr. Lyons exhibited 'bizarre' behavior that included harassing some of the female staff, making death threats against one of Pacific's employees, and brandishing a firearm. Ms. Schiller and Jennifer told Mr.

8

Taylor that they were afraid that Mr. Lyons would cause them great bodily injury. Pacific instituted new security protocols to address Ms. Schiller's and Jennifer's fear. Pacific blacked out the windows in its Human Resources Department because Mr. Lyons had been seen many times walking within three feet of the building that housed that department. Jennifer's office was moved from the outer perimeter to an interior part of the building. Ms. Schiller and Jennifer were permitted to park in the parking lot reserved for doctors, and security escorted them to their cars. With respect to the brandishing incident, Pacific employee Elio Chavez told Mr. Taylor that Mr. Lyons brandished a firearm in an elevator and said that if Mr. Chavez did not 'act correctly,' he would end up in a grave 'just like another Mexican had.'

"**F.    Content of Dr. Glaser's Testimony**

"Dr. Glaser testified at the hearing concerning the factors that are considered in assessing whether a person poses a threat for imminent dangerousness. Dr. Glaser testified that he was to examine Mr. Lyons in February 2011 in connection with Mr. Lyons's employment case against Pacific. Dr. Glaser spent 90 minutes with Mr. Lyons. Mr. Lyons refused to fill out any of the standard forms, to take any psychological tests, or to answer any of Dr. Glaser's standard forensic questions. Instead, Mr. Lyons went on a 90–minute 'rant' about how documents related to his employment case were forged and how Pacific's counsel in that action engaged in misconduct. Mr. Lyons stated that Mr. Muller and Mr. Fink were attempting to slander him, ruin his career, and 'possibly hurt him.' Dr. Glaser said Mr. Lyons's tone was paranoid and suspicious. Dr. Glaser was concerned that Mr. Lyons had a psychotic disorder, but was then unable to make a diagnosis as Mr. Lyons had not permitted him to perform a forensic examination. Later, based on his review of over four boxes or records that included a 'slew' of e-mails to Mr. Muller and others, Mr. Lyons's behavior patterns going back to 1998 when Mr. Lyons threatened someone with a bomb, and Mr. Lyons's attorney's telephone call to Mr. Muller warning him that Mr. Lyons was dangerous and violent, Dr. Glaser opined that Mr. Lyons had a delusional disorder, paranoid subtype.

"Dr. Glaser testified that the documents he reviewed included Mr. Lyons's medical records from Dr. Falcon. Mr. Lyons, representing himself, objected that Dr. Falcon had not certified the medical records and the records could have been altered. The trial court overruled the objection, and Dr. Glaser testified that Mr. Lyons's belief that the medical records could have been altered was part of his delusional disorder, persecutory subtype. Thus, according to Dr. Glaser, Mr. Lyons had displayed in court one of the symptoms of his psychotic disorder.

"Dr. Glaser said Mr. Lyons's medical records showed that he had been prescribed the anti-psychotic drug Seroquel. Dr. Glaser testified that he had observed Mr. Lyons in the courtroom and noticed some buccolingual movements that were consistent with tardive dyskinesia which can only be caused by the use of an anti-psychotic medication such as Seroquel. On cross-examination, Dr. Glaser admitted that he saw no entries for Seroquel on Mr. Lyons's records from the CVS pharmacy in Torrance.

"Among the documents that Dr. Glaser reviewed included Mr. Lyons's 2007 deposition testimony in which Mr. Lyons related that he had been convicted as a juvenile of a felony for ordering a 'hit' on a man who allegedly sexually abused him. Later, during his cross-examination of Dr. Glaser, Mr. Lyons introduced an errata sheet for his deposition that purported to "correct" his testimony and denied that he conspired to murder. Dr. Glaser was not aware of the errata sheet.

"Dr. Glaser reviewed the court transcript from a 1998 proceeding in which Mr. Lyons's co-worker sought a restraining order after Mr. Lyons made death threats against the co-worker and her children. According to Dr. Glaser, in assessing risk, threats from a person who has a delusional disorder are 'ominous' and a 'red flag' for increased risk of imminent violence. Dr. Glaser testified that where there is anger driven by delusional thoughts, there is an increased risk for violence. Later, during his cross-examination of Dr. Glaser, Mr. Lyons told the trial court that he had been in a relationship with the co-worker, she became angry when he married another woman, and he agreed to allow the trial court to issue a temporary restraining order against him even though his co-worker's case had fallen apart.

10

"Dr. Glaser reviewed some of the federal complaints Mr. Lyons had filed and asserted that the documents showed a similar pattern of people wronging Mr. Lyons with behavior that was illegal, improper, and threatening. Dr. Glaser said that Mr. Lyons's correspondence in the court files was significant in assessing Mr. Lyons's threat risk. Dr. Glaser testified that Mr. Lyons prided himself on his security work, and in connection with that work, Mr. Lyons had certain grandiose ideas. Dr. Glaser concluded that Mr. Lyons's alleged psychotic thinking and behavior 'statistically, demographically and clinically' increased Mr. Lyons's risk of imminent violence.

"Dr. Glaser reviewed documents that Mr. Lyons submitted in June 2011 in support of a petition for a restraining order against Mr. Muller and Mr. Fink in which Mr. Lyons claimed that Messrs. Muller and Fink wanted to attack him. Dr. Glaser also reviewed the document that Mr. Fink had received from Mr. Smyth. He opined that the document was 'concrete, hard forensic evidence of dangerousness.'

"Dr. Glaser testified that there is a strong link between stalking and physical violence. Researchers had found that a significant number of stalkers threaten and physically attack their victims. Dr. Glaser viewed Mr. Lyons's conduct in sending e-mails, faxes, clogging up fax machines, sending multiple copies of various complaints, and his use of the court system to be a form of stalking. Dr. Glaser opined that Mr. Lyons was a 'bright' man which made him more dangerous. Mr. Lyons's intelligence made the 'web of his conspiracy that much thicker.'

"**G.    Content of Mr. Lyons's Testimony** [Fn. omitted.]

"Mr. Lyons testified at the hearing that he was a good employee at Pacific. Mr. Lyons denied that he was prescribed the medication Seroquel.

"Mr. Lyons explained that his dentist's office was across the street from Pacific. Mr. Lyons had a tooth removed in May 2010. He parked down the street from the hospital and walked to his dentist's office. He visited his dentist four times in connection with his extracted tooth. After each visit, he received an e-mail from Mr. Fink asking

11

why he was near the hospital. Mr. Lyons believed that Mr. Fink was harassing and cyber-bullying him.

"Mr. Lyons testified that Pacific's petitions for restraining orders and Fink & Steinberg's restraining order with respect to Mr. Muller relied on declarations that were considered and rejected in prior restraining order proceedings. The record on appeal in case number B237507 contains the October 6, 2009, reporter's transcript from one of those proceedings. In that proceeding, Judge Joseph DiLoreto denied Pacific's request for restraining orders—which orders were to protect Ms. Schiller, Jennifer, and a third Pacific employee. In his ruling, Judge DiLoreto stated, 'So at this point in time, just not enough proof to prove, clear and convincing evidence, that there is a course of conduct, threatening, etc. I'm sure everybody is upset, but he never made threats to anybody, never threatened indirectly to do any harm to anybody. He's denied that. There is just no evidence.'

"Mr. Lyons testified that when the trial court issued temporary restraining orders to Pacific and Fink & Steinberg, the orders permitted him to use his firearm in his employment, but he had to turn in his firearm to his employer at the end of work each day. Mr. Lyons otherwise had to turn in his firearm to law enforcement. Mr. Lyons said that he refused to comply with the firearm restriction and did not turn in his firearm to law enforcement until the trial court threatened to hold him in contempt and incarcerate him.

"**H.    Trial Court Restraining Orders**

"At the conclusion of the hearing, the trial court issued permanent restraining orders against Mr. Lyons for a duration of three years. Among other things, the trial court ordered Mr. Lyons to surrender to a local law enforcement agency or sell to a licensed firearms dealer within 24 hours any firearms he owned or possessed. It further ordered Mr. Lyons not to contact the plaintiffs in any way or to enter their names in any internet search engine. The trial court based its ruling on all of the documents and pleadings in the court's file. The trial court found that Mr. Lyons had testified falsely,

12

either intentionally or as a symptom of a delusional syndrome as described by Dr. Glaser. The trial court found Dr. Glaser to be 'extremely' credible.

"The trial court found that Mr. Lyons presented a high risk of violence to any person who contradicted Mr. Lyons's version of events. It ruled that plaintiffs had presented more than enough evidence to show that they were reasonably in fear of violence from Mr. Lyons. Among other things, the trial court found that the document attached to an e-mail, sent by Mr. Lyons, exhorting Mr. Lyons to 'do something' strongly suggested that Mr. Lyons was ready to take action. Mr. Lyons appealed."

As noted above, we affirmed the trial court's orders granting plaintiffs' requests for restraining orders. The following facts took place after the facts set forth in our prior opinion:

In a declaration submitted in support of the request to renew the restraining order on Jennifer's behalf,[5] Mr. Muller stated that Mr. Lyons failed to obey the civil restraining orders and continued to harass and threaten Pacific and Fink & Steinberg (Mr. Muller's references to Pacific and Fink & Steinberg appear to refer also to Pacific's and Fink & Steinberg's employees who were protected by the restraining orders). Pacific and Fink & Steinberg reported the alleged violations to the Los Angeles Police Department and the matter was referred to the City Attorney's Office. The City Attorney's Office filed a misdemeanor complaint against Mr. Lyons asserting 33 counts of violating the restraining orders in this case. Mr. Lyons was convicted as charged and sentenced to several months in jail. As part of Mr. Lyons's sentence, the trial court stated that Mr. Lyons would be incarcerated for at least five years if he contacted Pacific or Fink & Steinberg after his release from jail.

Mr. Lyons was released from jail on October 30, 2012. Less than 24 hours later, he resumed his harassment of Pacific and Fink & Steinberg. The trial court that heard Mr. Lyons's criminal case sent Mr. Lyons to prison. Mr. Lyons was released from prison on or about August 29, 2014, and continued his harassing behavior.

---

**5** This is the only request to renew any of the restraining orders that is contained in the record on appeal. (See footnote 6, below.)

The hearing on plaintiffs' requests to renew the restraining orders took place on December 30, 2014.  Mr. Lyons checked in with the bailiff and attempted to file a peremptory challenge to the trial court under Code of Civil Procedure section 170.6 that the trial court rejected because Mr. Lyons had exhausted his peremptory challenges.  When the matter was called for a hearing, Mr. Lyons did not appear.  The trial court took judicial notice of the criminal action against Mr. Lyons in which Mr. Lyons was convicted of 33 counts of violating the four restraining orders in this case.  The trial court found sufficient evidence to renew the restraining orders.

## DISCUSSION[6]

### I.      Standards of Review

As we stated in our prior appeal, "we review an injunction issued under [Code of Civil Procedure] section 527.8 [(section 527.8)] to determine whether the necessary factual findings are supported by substantial evidence.  [Citation.]" (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 538.)  "If this 'substantial evidence is present no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld.  As a general rule, therefore we look only at the evidence and reasonable inferences supporting the successful party and disregard the contrary showing." (Pouler et al., Civil Procedure Guide, California Law and Motion Authorities (2012) § 62.17.)

---

[6]     We asked the parties to brief whether Mr. Lyons's failure to provide a reporter's transcript or a suitable substitute warrants affirmance based on the inadequacy of the record.  The relevant reporter's transcript is contained in the clerk's transcript in one of Mr. Lyons's four appeals (Case No. NS023727).  Accordingly, in that respect, the record is adequate.  Mr. Lyons failed, however, to designate any of the four requests to renew the restraining orders.  The only renewal request that is in the record is a copy of the request on Jennifer's behalf which is contained in Mr. Lyons's September 16, 2015, motion to augment the record that we granted above.  Because Muller's declaration in support of that renewal request addresses Mr. Lyons's alleged continuing harassing conduct against all plaintiffs and there is other evidence in the record relevant to the renewal of the restraining orders, we will not affirm the trial court's orders renewing the restraining orders based on the inadequacy of the record.

14

The trial court's decision to grant injunctive relief rests within its sound discretion "and will not be disturbed on appeal absent a showing of a clear abuse of discretion. [Citation.]" (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) A trial court abuses its discretion when its exercise of discretion "'exceeds the bounds of reason, all of the circumstances before it being considered.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) A trial court only "exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.) This is the most stringent standard of review. These are the principles we are obligated to follow on reviewing the trial court's orders.

We review questions of law de novo. (*Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 463.)

## II.     Relevant Principles

Subdivision (k)(1) of section 527.8 governs the renewal of a restraining order. Subdivision (k)(1) provides, "In the discretion of the court, an order issued after notice and hearing under this section may have a duration of not more than three years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party. These orders may be renewed, upon the request of a party, for a duration of not more than three years, without a showing of any further violence or threats of violence since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party. The request for renewal may be brought at any time within the three months before the expiration of the order."

15

## III. Double Jeopardy

Mr. Lyons contends that the trial court violated the double jeopardy clause of the Fifth Amendment of the United States Constitution when it renewed the restraining orders. The trial court did not err.

"The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that a person may not be twice placed 'in jeopardy' for the 'same offense.' 'The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple punishment for the same offense. [Citations.]' [Citation.]" (*People v. Anderson* (2009) 47 Cal.4th 92, 103-104; *People v. Parrish* (1985) 170 Cal.App.3d 336, 343 ["The double jeopardy clause of the Fifth Amendment forbids either multiple prosecutions or multiple punishment for the 'same offense.' (*North Carolina v. Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 665,89 S.Ct. 2072].)'"].)

An initial restraining order proceeding and a proceeding on a request to renew a restraining order are civil matters and not criminal prosecutions. In addition, although a person who violates a restraining order may be punished, the imposition of a restraining order or its renewal under section 527.8 is not itself a punishment. Accordingly, the constitutional bar on double punishment does not apply in this case. (*People v. Anderson, supra,* 47 Cal.4th at pp. 103-104; *People v. Parrish, supra,* 170 Cal.App.3d at p. 343.)


## IV. Collateral Estoppel

Mr. Lyons contends that the trial court's orders renewing the restraining orders are barred by the doctrine of collateral estoppel or issue preclusion. Issue preclusion did not bar the trial court's orders.

"The doctrine of collateral estoppel, 'or issue preclusion, "precludes relitigation of issues argued and decided in prior proceedings.'" (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123 Cal.Rptr.2d 432, 51 P.3d 297].) '"A prior determination

16

by a tribunal will be given collateral estoppel effect when (1) the issue is identical to that decided in a former proceeding; (2) the issue was actually litigated and (3) necessarily decided; (4) the doctrine is asserted against a party to the former action or one who was in privity with such a party; and (5) the former decision is final and was made on the merits." (*Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1339 [79 Cal.Rptr.2d 763].)'" (*Greene v. Bank of America* (2015) 236 Cal.App.4th 922, 932-933.)

Mr. Lyons appears to argue that because the issue of whether his conduct leading up to the 2011 restraining orders violated section 527.8 has already been litigated, the trial court erred in permitting that issue to be litigated again and to serve as the basis for renewing those restraining orders. Although Mr. Lyons is correct that issue preclusion prevents parties from relitigating issues between them that have already been decided, that principle does not assist him in this case. The issues in the initial proceeding for the restraining orders were not identical to the issues in the proceeding to renew those orders. The renewal proceeding concerned Mr. Lyons's alleged harassing conduct subsequent to, and in spite of, the trial court's imposition of the restraining orders in 2011. Thus, the doctrine of issue preclusion does not apply. Moreover, under section 527.8, subdivision (k)(1), plaintiffs were permitted to request renewal of the restraining orders "without a showing of any further violence or threats of violence since the issuance of the original order . . . ." That is, plaintiffs properly could rely on the evidence before the trial court in 2011 and on the trial court's prior determination—which determination we upheld on appeal—that Mr. Lyons harassed them. Additionally, even if the doctrine of issue preclusion applied in this case, it would operate to bar Mr. Lyons from relitigating the factual basis for the 2011 restraining orders, which he attempts to do throughout his briefs.

## V.      Sixth Amendment Right to Counsel

Mr. Lyons contends that the four orders renewing the restraining orders must be reversed as they were entered in violation of his Sixth Amendment right to counsel.

17

Because there is no right to counsel in a civil case, there was no violation of Mr. Lyons's Sixth Amendment right to counsel.

The United States Supreme Court has held that "the Sixth Amendment does not govern civil cases." (*Turner v. Rogers* (2011) 564 U.S. 431, 462.) The restraining orders in this case were civil matters, having been imposed and renewed under Code of Civil Procedure section 527.8. Accordingly, Mr. Lyons did not have a Sixth Amendment right to counsel.

## VI.    Fraud on the Court

Mr. Lyons argues that the four orders renewing the restraining orders must be reversed because plaintiffs' counsel committed fraud upon several different courts. We do not agree.

Mr. Lyons claims that plaintiffs' counsel perjured themselves in obtaining the 2011 restraining orders. This claim is an untimely attempt to challenge the sufficiency of the evidence underlying those restraining orders. Regardless, in Mr. Lyons's prior appeal, we held there was sufficient evidence under the applicable standard of review to support the restraining orders. Moreover, although new evidence is not required to renew a restraining order under section 527.8, subdivision (k)(1), plaintiffs based their requests to renew the restraining orders on conduct that took place after the trial court issued the initial restraining orders in 2011.

Mr. Lyons also claims that plaintiffs' counsel and the Deputy City Attorney who prosecuted him for violating the restraining orders withheld from him and the trial court Dr. Glaser's background—apparently Dr. Glaser's alleged use of marijuana and improper sexual relations with a client. Mr. Lyons's claim, however, concerns an August 14, 2014, probation violation hearing, apparently in connection with his 33 misdemeanor convictions for violating the restraining orders in this case and not the December 30, 2014, hearing on plaintiffs' requests to renew the restraining orders. Mr. Lyons further contends that plaintiffs' counsel did not disclose the fact of the August 14, 2014, probation violation hearing to the trial court in connection with the December 30, 2014,

restraining order renewal hearing.  Even if that were true, however, Mr. Lyons was not prejudiced as the trial court took judicial notice of Mr. Lyons's criminal file at the renewal hearing.

**DISPOSITION**

The orders are affirmed.  Costs on appeal are awarded to plaintiffs pursuant to Code of Civil Procedure section 1034 and California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KUMAR, J.*


We concur:


KRIEGLER, Acting P. J.


BAKER, J.


---

\*      Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19